**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF PUERTO RICO**

LOPEZ & MEDINA CORP., d/b/a EMMANUEL
TRAVEL & TOURS,

     Plaintiff,

        v.                                      CIVIL NO. 05-1595 (PG)

MARSH USA, INC., ET AL.,

     Defendants.

<u>**OPINION AND ORDER**</u>

Before the Court are plaintiff Lopez & Medina Corp.'s (hereinafter "L&M" or "Plaintiff") Cross-Motion for Summary Judgment (Docket Nos. 83-85) and defendant United States Aircraft Insurance Group's[1] (hereinafter "USAIG" or "Defendant") Opposition thereto (Docket No. 88). Plaintiff's motion aims to lay to rest the dispute as to whether an insurance policy issued by Defendant covers the breach of contract claim that Plaintiff originally sued under. Both parties submit that the question of insurance policy coverage is dispositive in this case and that, since there are no material facts in dispute, judgment as a matter of law should be entered based on a definitive legal interpretation of the policy. After close examination of the policy in question, applicable statutory and case law, and insurance law treatises that provide useful guidance in this field, the Court **DENIES** Plaintiff's cross-motion for summary judgment and **DISMISSES** the case **WITH PREJUDICE**. The Court expounds as follows.

---

[1] United States Aviation Underwriters, Inc., ("USAUI") manages USAIG, the named defendant, and the other underwriters and co-insurers involved in the comprehensive general liability policy that USAUI issued and is the subject of this action. For the sake of consistency with the parties' motions and memoranda, the Court also refers to the insurance company defendants collectively as "USAIG" or "Defendant."

## I. Background

### A. Procedural Background

Plaintiff, a Puerto Rico-based travel agency, filed the instant suit against USAIG on June 3, 2005, alleging that it is liable under Puerto Rico's Direct Action Statute, P.R. LAWS ANN. tit. 26, § 2003, for risks insured under Airline Insurance Form PA-01, Policy # SIHL1-200A (hereinafter "the Policy"). The Complaint posits that the risk of a breach of contract is covered under the Policy, and thus, that the insurers are directly liable to Plaintiff within the maximum limit of their combined policies for the economic damage caused by said breach, alleged to amount to ten million dollars ($10,000,000.00).

On August 21, 2007, USAIG on behalf of all defendants, filed a motion for summary judgment (Docket No. 39) along with a statement of undisputed material facts (Docket No. 40).  After carefully studying this motion as well as the opposition thereto and subsequent reply, the Court denied the motion.  In its Opinion, the Court rejected Defendant's arguments that the claims were precluded under the *res judicata* doctrine and that the Direct Action statute did not apply extraterritorially to Defendant's acts in Puerto Rico. (See Docket No. 75.) During a status conference held on September 30, 2009, Defendant expressed its intention of certifying for interlocutory appeal the issue of whether the Policy covered a breach of contract claim.  Defendant, however, opted against this litigation strategy and instead filed a supplemental memorandum of law on the issue of insurance coverage, asking the Court to dismiss the case with prejudice because the Policy does not cover Plaintiff's breach of contract claim irrespective of whether the facts prove or disprove that such a breach occurred. (See Docket No. 80.)

Plaintiff, in response, moved the Court to file its own supplemental memorandum of law on the issue of insurance coverage.  Plaintiff instead, and

one month past the memorandum filing deadline, filed the cross-motion for summary judgment now before the Court (Docket No. 83), along with a statement of uncontested material facts (Docket No. 84) and a supporting memorandum of law (Docket No. 85). Defendant, for its part, submitted an opposition to Plaintiff's cross-motion (Docket No. 88). In essence, Plaintiff's cross-motion argues that the Policy specifically covers a breach of contract action for damages arising from an aircraft owner and a charterer's failure to provide air transportation to Plaintiff's passengers as required by contract. Plaintiff asks the Court to either grant summary judgment in its favor on the issue of insurance coverage, in order for this legal issue to be properly presented to the First Circuit on future appeal, or deny the motion, in order to allow the Court to rule on whether a breach of contract actually occurred, which implicates material facts in controversy.

The Court rejects Plaintiff's formulation of its request for relief. After carefully analyzing the cross-motion for summary judgment, as well as Defendant's supplemental memorandum of law and opposition to the cross-motion, and drawing factual inferences against each movant in turn, the Court has determined that the Policy clearly and unambiguously does not provide coverage for a breach of contract claim. Because Plaintiff's suit against the insurers stands or falls on whether the Policy covers the breach of contract claim upon which the Complaint is premised, it must fail and the case must be dismissed.

## B. Factual Background: Material Facts not in Genuine Issue or Dispute

The following factual narrative is derived from facts that are deemed uncontested by the Court because they were included in the motions and cross-motions for summary judgment, as well as oppositions, and were agreed upon or properly supported by the evidence and not genuinely opposed. The Court emphasizes only facts considered material and non-repetitive.

On September 10, 2001, Pace Airlines, Inc. ("Pace") and Patriot Air, LLC ("Patriot") entered into an Aircraft Charter and Management Agreement ("Charter Agreement").  Under the terms of the Charter Agreement, Patriot leased certain Boeing 737 aircraft from Pace and retained Pace to operate and manage the aircraft pursuant to an Air Carrier Certificate issued by the Federal Aviation Administration (FAA).  On May 15, 2002, L&M and Patriot signed a Passenger Aircraft Charter Agreement, No. PA-01078 ("Passenger Agreement"), under which Patriot was to operate as an indirect air carrier and L&M as a charterer of pre-scheduled passengers flights on the Boeing 737 aircraft containing one hundred and twenty-two (122) economy class seats.  According to the Passenger Agreement, Patriot would provide flight transportation while L&M would submit a schedule of flights to Patriot in advance of the month in which such flights were to occur.  The concept was marketed as "Dream Air operated by Pace Airlines."

The first charter flight was scheduled to take place on June 1, 2002; however, before that could happen, Patriot required that L&M provide a surety bond in the amount of two hundred thousand dollars ($200,000.00) to guarantee L&M's performance of the Passenger Agreement.  L&M acquired the bond at a cost of fifty thousand dollars ($50,000.00) issued by United Surety and Indemnity Company.  The Passenger Agreement further required that L&M, as charterer, make advance deposits in Patriot's escrow account of an amount equal to the scheduled flight hours multiplied by a cost of four thousand nine hundred fifty dollars ($4,950.00) for the applicable period.

The first charter flight took place from Luis Muñoz Marin International Airport in San Juan, Puerto Rico, to the Dominican Republic on June 20, 2002.  Subsequent flights took place on the following dates: July 3, 4, 7, 8, 11, 12, and 14 of 2002.  Between the months of June and July 2002, however, L&M and Patriot exchanged a series of communications regarding the alleged lack of payment by L&M.  The contractual dispute led to Patriot terminating the

Passenger Agreement on July 18, 2002.  On September 18, 2002, Patriot filed for bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Northern District of Texas.  See In Re: Patriot Air, LLC, Case No. 3:02-BK-38187-HDH (Bankr. N.D. Tex.).  L&M filed a proof of claim against Patriot for failure to provide air transportation to its booked passengers under the Passenger Agreement.  However, after the Chapter 11 proceedings were converted to a Chapter 13 liquidation, the bankruptcy court disallowed L&M's claim against Patriot Air.  The bankruptcy proceedings were terminated on August 31, 2004.

On September 1, 2001, before the above-described events took place, United States Aviation Underwriters, Inc. ("USAUI") and other defendant co-insurers, collectively denominated "USAIG," issued Airline Insurance Form PA-01, Policy #SIHL1-200A, which the Court refers to as "the Policy," to Pace as the "Name Insured."  Two (2) Boeing 737-200 aircraft with registration numbers N249TR and N250TR are listed as the subject of the aviation insurance coverages under the Policy.

Beyond these factual stipulations, the parties, in their respective statements of uncontested material facts, disagree as to the correct interpretation of the Policy's coverage.  Defendant particularly disagrees that other contractual agreements and non-contractual acts and/or omissions can be used to decipher the Policy's plain language and meaning.  For the reasons that follow, the Court agrees with Defendant and deems the undisputed material facts sufficiently dispositive of the case at bar.

## II. Discussion

### A. Motion for Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law

based on the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits. Fᴇᴅ. R. Cɪᴠ. P. 56(c); Prescott v. Higgins, 538 F.3d 32, 40 (1st Cir. 2008). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." Prescott, 538 F.3d at 40 (internal citations and quotation marks omitted). "A fact is material if it has the potential of determining the outcome of the litigation." Id. (quoting Maymi v. P.R. Ports Auth., 515 F.3d 20, 25 (1st Cir. 2008)). Cross-motions for summary judgment do not change this standard. Latin American Music Co. v. The Archdiocese of San Juan, 499 F.3d 32, 38 (1st Cir. 2007) (citing Specialty Nat'l Ins. Co. v. OneBeacon Ins. Co., 486 F.3d 727, 732 (1st Cir. 2007)); see also Blackie v. Maine, 75 F.3d 716, 721 (1st Cir. 1996) (noting that, in conducting a canvass of the record, the court must mull each motion separately, drawing inferences against each movant in turn)).

To be successful in its attempt, the moving party must demonstrate the absence of a genuine issue as to any outcome-determinative fact in the record through definite and competent evidence. See DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997); Maldonado-Denis v. Castillo Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994). Once the movant has averred that there is an absence of evidence to support the non-moving party's case, the burden shifts to the non-movant to establish the existence of at least one fact in issue that is both genuine and material. See Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (internal citations omitted). If the non-movant generates uncertainty as to the true state of any material fact, the movant's efforts should be deemed unavailing. See Suarez v. Pueblo Int'l, 229 F.3d 49, 53 (1st Cir. 2000). While the mere existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment," the Court may grant the motion if the non-moving party rests merely upon "conclusory allegations, improbable inferences, and unsupported

speculation." Forestier Fradera v. Municipality of Mayaguez, 440 F.3d 17, 21 (1st Cir. 2006) (quoting Benoit v. Technical Mgf. Corp, 331 F.3d 166, 173 (1st Cir. 2003)).

At the summary judgment juncture, the Court must examine the facts in the light most favorable to the non-movant, indulging that party with all possible inferences to be derived from the facts. See Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir. 2002). The Court must review the record "taken as a whole," and "may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135 (2000). This is so because credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Id.

## B. Insurance Policy Construction

### 1. Puerto Rico Insurance and Contract Law

The parties agree that the material facts relevant to the question of insurance coverage are not in dispute and that the only question left to be answered by the Court is a question of law: does the Policy cover Plaintiff's breach of contract action against Patriot and Pace?  If the Court answers this question in the affirmative, the case must continue and the Court will have to reach the merits of Plaintiff's breach of contract claims against Patriot and Pace.  If the Court answers this question in the negative, the case against the insurers must be dismissed because they do not cover this type of claim, and therefore, cannot be held liable for it.  Because the Court is primarily concerned with the meaning of the Policy's language and terms, and this suit is based on diversity of jurisdiction, this Court is circumscribed by the interpretative methods set forth under Puerto Rico law.

Under Puerto Rico law, the Insurance Code of Puerto Rico controls the interpretation of insurance contracts.  See P.R. LAWS ANN. tit. 26, § 1101-1137; Jimenez v. Triple S., Inc., 154 F. Supp. 2d 236, 238 (D.P.R. 2001); Puerto Rico Electric Power Authority v. Phillips, 645 F. Supp. 770, 772 (D.P.R. 1986). Section 1125 of the Insurance Code provides that "[e]very insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any lawful rider, endorsement, or application attached to and made a part of the policy." P.R. LAWS ANN. tit. 26, § 1125.  When the Insurance Code does not provide an interpretive approach for a particular situation, the Civil Code is used as a supplemental source of law in interpreting the insurance contract. Velez-Gomez v. SMA Life Assur. Co., 8 F.3d 873, 875 (1st Cir. 1993).

Under the Puerto Rico Civil Code, when the language and terms of a contract are clear, Article 1233 and the parol evidence rule require that the Court strictly enforce the literal sense of the written contract and exclude parol evidence.  See Caribbean Forms Manuf., Inc v. Karon, 73 F. Supp. 2d 139, 142 (D.P.R. 1999) (citing Borschow Hosp. & Medical Supplies, Inc. v. Cesar Castillo, 96 F.3d 10, 15-16 (1st Cir. 1996)); P.R. LAWS ANN. tit. 31, § 3471 ("If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed. If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail.").  Puerto Rico's Parol Evidence Rule provides:

> When in an oral or written agreement, either public or private, all the terms and conditions constituting the true and final intention of the parties have been included, such agreement shall be deemed as complete, and therefore, there can be between the parties, or successors in interest, no evidence extrinsic to the contents of the same, except in the following cases:
>
> (1) Where a mistake or imperfection of the agreement is put in issue by the pleadings;

    (2) Where the validity of the agreement is the fact in dispute.

    This rule does not exclude other evidence of the circumstances under which the agreement was made or to which it is related such as the situation of the subject matter of the instrument or that of the parties, or to establish illegality or fraud.

P.R. Laws Ann. tit. 32, App. IV, R. 69(B) ("Rule 69(B)").

    The First Circuit Court of Appeals has interpreted this rule in tandem with Article 1233 to require courts to ignore parol evidence when the agreement is "clear and unambiguous." See Borschow Hosp. & Medical Supplies, Inc., 96 F.3d at 15. Under Puerto Rican law, an agreement is 'clear' when it can be understood in one sense alone, without leaving any room for doubt, controversies or difference of interpretation. Id. In summary, these provisions bar consideration of extrinsic evidence to vary the express, clear, and unambiguous terms of a contract. Id. Applying these provisions to insurance contracts, in cases where the contractual terms are clear, the Court is "constrained to give the language of the policies its literal meaning and must restrain itself from indulging in an analysis of the alleged intent of the parties." Jimenez, 154 F. Supp. 2d at 239 (citing Vulcan Tools of Puerto Rico v. Makita USA Inc., 23 F.3d 564, 567 (1st Cir. 1994)). Finally, it is worth noting that under Puerto Rico law, insurance contracts are considered contracts of adhesion and are to be liberally construed in favor of the insured. See Fajardo Shopping Center, S.E. v. Sun Alliance Ins. Co. of Puerto Rico, 167 F.3d 1, 7 (1st Cir. 1999) (citing Quinones Lopez v. Manzano Pozas, P.R. Offic. Trans. RE-91-567 (P.R. 1996)).

## 2. The Policy's Terms of Coverage

    With this interpretative method in mind, the Court can now delve into the Policy's specific language and decide whether to admit extrinsic evidence to interpret any ambiguous terms in line with the parties' intent. Plaintiff

admits that the Policy extends one type of coverage under "Part II - Physical Damages" for Pace's conventional aviation risks and physical damages to the insured aircraft, which is "inapplicable to plaintiff's claims." (See Docket No. 85 at 3.)  Plaintiff, however, argues that the Policy extends a second type of coverage under "Part I - Liability Coverage," called comprehensive general liability[2] ("CGL") that "specifically cover[s] third-party liabilities arising from Pace's insured Airline Operations (i.e. non-owner, or aircraft charterer, third-party liabilities) as said term is defined in the Policy." (Id.) Plaintiff states that the Policy's own language clearly identifies and distinguishes third-party liability risks including contractual liabilities labeled as "offenses" in the Policy from conventional aviation risks labeled as "occurrences."

Moreover, Plaintiff narrows the Court's focus under Part I of the Policy to Group 3 of the personal injury offenses as the specific clause covering the Complaint's allegations.  This section of the Policy provides:

1. COVERAGE

The INSURER will pay on behalf of the INSURED all sums which the INSURED shall become legally obligated to pay as damages arising out of the Named Insured's Airline Operations because of:

. . .

B. PERSONAL INJURY arising out of one or more of the following offenses committed during the policy period;

. . .

Group 3. - Refusal or withholding of transportation or other public accommodation; but coverage hereunder shall not apply to payments made by the Insured under the provisions of its tariffs or contract of carriage, to persons holding confirmed reserved space on a flight and who are denied boarding on such flights whether such space is relinquished voluntarily or involuntarily.

---

[2] Comprehensive general liability and commercial general liability are used interchangeably and shortened to the acronym "CGL" for the sake of simplicity.

(Docket No. 40, Exhibit 10, at 3.)  As Plaintiff admitted in the cross-motion for summary judgment, "Plaintiff's allegations are precisely based on Pace's and/or Patriot's sudden wrongful failure to provide air transportation to third-party, L & M, as contracted." (Docket No. 85 at 4.)

Beyond the specific language quoted above, Plaintiff asks the Court to draw inferences from the intent of Pace and Patriot in securing non-aviation liability insurance coverage for Patriot's sponsored charter program under the Charter Agreement.  Plaintiff would like to draw the Court's attention to the Charter Agreement and a Certificate of Insurance issued by co-defendant Marsh USA, Inc.[3], as evidence of Pace's intent to assume the contractual liabilities of Patriot under several provisions of the Policy providing coverage for an "approved contract."

The Court, however, is circumscribed by Puerto Rico's insurance and contract law and refuses to look outside the four corners of the Policy unless there is an inherent ambiguity in the contested language.  There is none.  The operative language at issue, edited and italicized for emphasis, provides: "The insurer will pay on behalf of the insured all sums which the insured shall become *legally obligated to pay as damages* arising out of the Named Insured's Airline Operations because of . . . *personal injury* arising out of . . . *refusal or withholding of transportation* or other public accommodation. . . ." (See Docket No. 40, Exhibit 10, at 3.)  Plaintiff would like nothing more than to cabin its breach of contract claim arising from Pace and Patriot's allegedly wrongful refusal to transport Plaintiff's passengers into this clause.  However, the Court agrees with Defendant in its opposition that Plaintiff's creative attempt must fail because the Policy's plain language, clarified by its definitions, relevant treatises, and case law, is clear and unambiguous.  Plain

---

[3] Marsh USA, Inc. was voluntarily dismissed on June 5, 2006, by stipulation of Plaintiff.

language dictates that this specific clause only apply to (1) tort claims, (2) for personal injuries, (3) arising out of Pace's refusal of transportation, (4) for offensive or wrongful reasons, such as discriminatory animus. Constructing the clause's language, word for word, commands this result. Since Plaintiff does not raise any issue surrounding the viability of the Policy as a contract, such as by pleading fraud, mistake, or partial integration, the Court will not consider any extrinsic evidence, including the Charter Agreement, Passenger Agreement, or the Certificate of Insurance, to interpret or alter the Policy's contents.

### (i) The Policy Covers Tort, not Contractual, Liability

As Defendant points out, the phrase "legally obligated to pay" in a CGL policy generally refers only to tort claims and not contract claims. Although the First Circuit Court of Appeals has not squarely addressed this issue, numerous Circuit Courts have so held. See VBF, Inc. v. Chubb Group of Ins. Companies, 263 F.3d 1226, 1231 (10th Cir. 2001) ("The phrases 'legally obligated to pay' and 'liability imposed by law' refer only to tort claims and not contract claims") (internal citations omitted)); Data Specialties, Inc. v. Transcontinental Ins. Co., 125 F.3d 909, 911 (5th Cir. 1997) ("After reviewing these sources, we conclude that a Texas court would rule that the CGL policy language 'legally obligated to pay as damages' applies only to tort-based obligations."); Stanford Ranch, Inc. v. Maryland Cas. Co., 89 F.3d 618, 624 (9th Cir. 1996) ("California courts have consistently interpreted this language ['legally obligated to pay'] to cover only tort liabilities and not those liabilities arising in contract.")) This is also the majority view among the state courts. See, e.g., Hartford Acc. & Indem. Co. v. A.P. Reale & Sons, Inc., 228 A.D.2d 935, 936-37 (N.Y. App. Div. 1996) ("This disposition is in accord with the purpose of a [CGL] policy which is to provide coverage for tort

liability . . . and not for contractual liability of the insured for economic loss. . . ."); Wisconsin Label Corp. v. Northbrook Property & Cas. Ins. Co., 607 N.W.2d 276, 343 (Wis. 2000) ("A CGL policy is not a performance bond; it provides coverage 'for tort damages but not for economic loss resulting from contractual liability.") A review of Puerto Rico's case law yields the same result.  The Puerto Rico Supreme Court has explained that "[i]n general, civil (tort) liability insurance contracts seek primarily to 'protect the insured against civil (tort) liability incurred with regard to third persons for acts for which he is [legally] liable." Melendez Pinero v. Levitt & Sons of Puerto Rico, Inc., P.R. Offic. Trans. 735,848 (1991) (citing J. Castelo Matran, DICCIONARIO MAPFRE DE SEGUROS 264, Madrid, Ed. Mapfre (1988)) (explaining at length the history and purpose of the insurance industry's CGL policy)).

Learned insurance law treatises and commentators agree.  See, e.g., 7A Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 103:14 (3d ed. 2008) ("While the phrase 'legal liability' includes liability assumed by contract, the phrases 'liability imposed by law,' and 'legally obligated to pay as damages' do not."); 2 Allan D. Windt, Insurance Claims and Disputes § 11:7 (5th ed. 2009) ("Numerous courts have held that the provision in an insuring clause agreeing to pay on behalf of the insured sums that the insured becomes 'legally obligated to pay as damages' refers to liability imposed by law for torts, and not to damages for breach of contract.") The renown treatise Couch on Insurance explains that CGL policies:

> [A]re intended to provide coverage only for events which are fortuitous, unforeseeable events, and not for the foreseeable results of an insured's deliberate conduct, which would include a claim for breach of contract. A [CGL] policy is designed and intended to provide coverage to the insured for tort liability for physical injury to the person or property of others. A [CGL] is not intended to provide coverage for the insured's contractual liability which merely causes economic losses.

Russ & Segalla, supra, § 129:4.

Further confirmation can be found by reference to the text of the Policy's other listed groups of covered personal injury offenses (paraphrased below), which all invoke torts of one kind or another, but not once a contractual claim:

> (1) Group 1 - false arrest, detention, imprisonment, malicious prosecution;
> (2) Group 2 - wrongful entry or eviction, or other invasion of the right of private occupancy;
> (3) Group 4 - incidental medical malpractice, error or mistake;
> (4) Group 5 - libel or slander or other defamation;
> (5) Group 6 - publication or utterance of misinformation (i.e. deceptive advertising) with respect to the availability of transportation or other public accommodation; and
> (6) Group 7 - discrimination.

(See Docket No. 40, Exhibit 10, at 3.)  The definition of "personal injury"[4] and the plain meaning of the above-listed personal injury offenses corroborate that coverage under this specific section of the Policy is, generally speaking, for tortious offenses against the person, such as torts committed against a person's dignity or privacy interests.

Furthermore, the phrase "refusal or withholding of transportation or other public accommodation" has a distinct connotation under federal law related to discrimination, as elucidated by Department of Transportation aviation regulations prohibiting discrimination on the basis of disability.  See 14 C.F.R. § 382.19 ("As a carrier, you must not *refuse to provide transportation* to *a passenger* with a disability on the basis of his or her disability. . . .") (emphasis added); see also Perez-Ramos v. Spirit Airline, Inc., No. 08-1574, slip op. at 2 (D.P.R. Mar. 25, 2009) (noting that federal aviation regulations include a general prohibition against discrimination and a specific prohibition against discriminatory "refusal of transportation"); Deterra v. America West

---

[4] The Policy provides that: "'Personal injury' means injury to any person or organization, other than Bodily Injury or Property Damage. (Docket No. 40, Exhibit 10, at 18.)  While corporations such as Patriot and L&M are usually considered persons under the law, it is worth noting that the Policy specifically includes organizations in its definition, but not corporations.

<u>Airlines, Inc.</u>, 226 F. Supp. 2d 298, 306 (D. Mass. 2002) (discussing the same provisions).

As Defendant correctly argues, the language that follows the phrase "refusal of transportation" highlights its general import, which is to cover natural persons engaged in boarding an airplane.  This language specifically excludes those ticketed passengers who are "bumped" out of their reserved seats from oversold aircraft, a common industry practice, and in so doing, refers to natural "persons:" "[b]ut coverage hereunder shall not apply to payments made by the Insured under the provisions of its tariffs or contracts of carriage, to *persons* holding confirmed reserved space on a flight and who are *denied boarding* on such flights. . . ." (Docket No. 40, Exhibit 10, at 3) (emphasis added).  As clear as the night follows the day, this language refers to ticketed passengers who are natural persons, not corporations such as Patriot, an indirect air carrier, or L&M, a third-party charterer.  When read together with the other covered offenses, as well as within the context of its exclusion for persons who are "bumped" from oversold aircraft, the clause's plain language and meaning clearly and unambiguously covers only tort claims brought by natural persons who have been wrongfully refused the right to transportation on Pace's aircraft.

Plaintiff admits that the Complaint is premised only on a breach of contract claim not involving any liability, independent of contractually imposed obligations, for torts committed by either Pace or Patriot.  Therefore, this ground alone is sufficient to dismiss the case with prejudice.  Plaintiff's interpretation of the Policy's text and arguments to the contrary are deemed unavailing, especially in light of the fact that Plaintiff has cited to no cases and scant authority to support its arguments.  The Court, nevertheless, will elaborate separate and additional grounds for dismissal.

**(ii) The Charter Agreement is not an "Approved Contract"**

Plaintiff argues that USAIG assumed the contractual liability of Patriot by way of an indemnification clause in the Charter Agreement, alleged to be an "approved contract" under the Policy, in which Pace agreed to indemnify Patriot for all claims for damages arising from any act of Pace.  The Policy defines "approved contract" as "any written contract or agreement entered into by the Named Insured in which the Named insured has agreed to assume the liability of another person or organization for Bodily Injury, Property Damage or Personal Injury and which contract or agreement is *reported* to the Company. . . ." (Docket No. 40, Exhibit 10, at 16) (emphasis added).  Neither bodily injury, property damage, or personal injury properly describes the injury that Plaintiff alleges: economic injury to L&M's contractual rights.  Plaintiff also entirely fails to show that the Charter Agreement was reported to USAIG as required by the Policy.

Even if the Court were to consider the Charter Agreement an approved contract, only indemnity or hold harmless agreements covering tort, not contractual liability, are ordinarily deemed approved contracts.  The treatise Insurance Claims and Disputes explains that:

> The provision in standard liability policies stating that there is coverage for certain liability assumed in a [so-called "approved" or "insured" contract] does not lead to a contrary result. The foregoing policy provision refers to certain indemnity and hold harmless agreements. And it refers to an underlying *tort liability* that was assumed, *not* to an underlying contractual liability.

Windt, supra, § 11.7 (emphasis added); see also 3 Gordon L. Ohlsson, The Law of Liability Insurance, § 11A.05 (2009) (contractual liability coverage in a CGL policy "is designed to pay only for tort liability that is assumed by contract, i.e., by an indemnity or hold harmless agreement. It is not designed to provide coverage for damages arising from breach of contract.").  The Alaska Supreme Court, in an illustrative case, reasoned that "'liability assumed by the insured

Civil No. 05-1595 (PG)                                                        Page 17

under any contract' refers to liability incurred when one promises to indemnify
or hold harmless another, and does not refer to liability that results from
breach of contract." <u>Olympic, Inc. v. Providence Washington Ins. Co. of Alaska</u>,
648 P.2d 1008, 1010-11 (Alaska 1982) (internal citations omitted).  A California
appellate court, quoting from a modern California insurance treatise, also
observed that:

> The contractual liability endorsement provides coverage only when there
> is tort liability. More specifically, the endorsement covers third party
> tort liabilities that the insured assumes by contract. It does not cover
> damages suffered by a third party as a result of the insured's breach of
> contract entered into with that party.

<u>Loyola Marymount Univ. v. Hartford Accident & Indem. Co.</u>, 219 Cal. App. 3d 1217,
1226 (Cal. Ct. App. 1990).  The case law is practically uniform in this regard.
The Charter Agreement, or any agreement other than the Policy for that matter,
even if considered an approved contract, could not cover a breach of contract
claim like the one Plaintiff has brought against the insurers.  Even so,
Plaintiff never represented as a fact, and therefore the Court never made a
factual finding, that Pace reported the Charter Agreement as an approved
contract to USAIG, as required by the Policy. (<u>See</u> Docket No. 40, Exhibit 10,
at 25.)  Therefore, the Court concludes that (1) the Charter Agreement is not
an approved contract under the Policy's plain language and meaning, and (2) even
if the Charter Agreement were an approved contract, the Policy would only assume
contractual liability for Pace's torts against third-parties, not for any
alleged breach of a business contract arising from Pace's acts or omissions.

**(iii) Breach of Contract Claims are Specifically Excluded under the Policy**

The final nail in this case's coffin is the express exclusion of
contractual liability, in general, and, in particular, of economic injury

resulting from a lack of performance under contract.  The Policy provides, in pertinent part:

> 3. EXCLUSIONS (Applicable to Part I)
> THIS INSURANCE DOES NOT APPLY:
>
> . . . .
>
> (b) to liability assumed by an Insured, under *any contract or agreement*; but this exclusion does not apply:
>
>> (1) to liability assumed by the Named Insured under an Approved Contract. . . .
>
> . . . .
>
> (j) to loss of use of tangible property which has not been physically injured or destroyed resulting from
>> (1) a delay in or lack of performance by or on behalf of the Named Insured of *any contract or agreement*, or
>>
>> (2) the failure of the Named Insured's products or *work performed* by or on behalf of the Named Insured to meet the level of performance, quality, fitness or durability warranted or represented by the Named Insured. . . .

(Docket No. 40, Exhibit 10, at 4-7) (emphasis added).  As the Court has ruled that the Charter Agreement is not an approved contract, an exception to exclusion 3(b), the Policy clearly precludes coverage for liability assumed by Pace under "any contract or agreement," thus including the Charter Agreement's indemnification clause.

Puerto Rico's case law and insurance treatises confirm that "[t]he purpose of this so-called 'contractual assumed liability exclusion' is to limit the [CGL] coverage to non-contractual civil (tort) liability." Melendez Pinero, 1991 P.R. Offic. Trans. 735,848; see also Vega v. Pepsi-Cola Bot. Co., 18 P.R. Offic. Trans. 763, 770 (P.R. 1987) ("The purpose of the exclusion is clear. The policy coverage is limited to the insured's field of tort liability *excluding* the insured's contractual obligations.")(citing 12 Couch on Insurance § 44A:36 (2d ed. 1981)) (emphasis added)).  Couch on Insurance, quoting standard CGL exclusion language almost identical to the Policy's, explains that "[c]ommercial

general liability policies generally contain provisions specifically excluding from coverage liability assumed by the insured under a contract." Russ & Segala, <u>supra</u>, § 129:31.  As these authorities make clear, a CGL policy like the one in question is intended to cover only the insured's tort liabilities, excluding liability assumed by contract with substantially similar language as that quoted above, in order to further this purpose.

Plaintiff's breach of contract claim is also arguably excluded under exclusion 3(j) based on the facts alleged in the Complaint.  Plaintiff sued for a breach of contract precisely due to the "loss of use of tangible property" (Pace's aircraft) allegedly resulting from a "lack of performance by or on behalf of [Pace] of any contract. . ." or "the failure of . . . work performed by or on behalf of [Pace] to meet the level of performance . . . represented by [Pace]. . . ." (See Docket No. 40, Exhibit 10, at 4-7.)  The Court, however, finds that exclusion 3(b) is abundantly clear and suffices as an adequate ground for dismissal, thereby obviating any need to determine whether Pace's aircraft fits within the definition of "tangible property" under the Policy's terms.

As this District Court, quoting from the Puerto Rico Supreme Court's case Melendez Pinero v. Levitt & Sons, has stated: "If an exclusion clause is clear and unambiguous and applicable, then it does not afford coverage despite whatever inferences may arise from the other clauses in the contract. Each exclusion clause should be read independently from the others and according to its functions in the policy's general agreement." Nahan v. Pan American Grain Manuf. Co., 62 F. Supp. 2d 419, 423-24 (D.P.R. 1999) (internal quotation marks and citations omitted)).  Exclusion 3(b) is clear and unambiguous in declaring that coverage does not extend to liability assumed under any contract or agreement.  As Plaintiff's case against Defendant is premised solely on a breach of contract claim specifically excluded under the Policy, it must be dismissed as a matter of law for lack of coverage.

Civil No. 05-1595 (PG)                                                    Page 20

### III. Conclusion


     For the numerous reasons above explaining why the Policy does not cover Plaintiff's breach of contract claim against either Patriot or Pace, the Court **DENIES** Plaintiff's cross-motion for summary judgment and **DISMISSES** the case **WITH PREJUDICE.**   Because the material facts surrounding the Policy's terms of coverage are undisputed, and the Policy clearly and unambiguously does not cover Plaintiff's claims against the insurers, Defendant is entitled to judgment as a matter of law.


     **IT IS SO ORDERED.**

     In San Juan, Puerto Rico, March 8, 2010.


                                        S/ JUAN M. PÉREZ-GIMÉNEZ
                                        JUAN M. PÉREZ-GIMÉNEZ
                                        UNITED STATES DISTRICT JUDGE